**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Arthur Morrison, | : Civil Action |
| | : |
| Plaintiff | : No. |
| | : |
| v. | : |
| | : Jury Trial Demanded |
| Custom Processing Services, Inc., Jennifer | : |
| Adams, and Stephanie Readinger | : |
| | : |
| Defendants | : |

## COMPLAINT

### Introduction

1.     Plaintiff Arthur Morrison (Morrison) is suing his former employer, Custom Processing Services, Inc. (the Company), and its human resources professionals, Jennifer Adams (Adams) and Stephanie Readinger (Readinger), for failing to accommodate his requests for reasonable accommodations due to his disability, retaliating against him for requesting reasonable accommodations due to his disability, firing him due to age discrimination and disability discrimination or retaliation, and firing him for requesting and/or utilizing FMLA-qualifying leave.

2.     Morrison brings his case under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), the Americans with Disabilities Act of 1990, as amended, 42 U.S.C.A. § 12101 et seq. (ADAAA), the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. (PHRA), and the Family and Medical Leave Act, 29 U.S.C. §2601 et seq. (FMLA).

3.     Morrison seeks back pay, reinstatement or front pay, loss of earnings capacity, compensatory damages (under the ADAAA and PHRA), liquidated damages (under the ADEA

1

and FMLA), punitive damages (under the ADAAA), interest, negative tax consequence damages, injunctive relief, and attorney's fees and costs.

## Jurisdiction And Venue

4.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and the ADEA, ADAAA, and FMLA. Furthermore, Defendants' conduct violated the PHRA and the pendant jurisdiction of this Court is invoked to remedy those violations.

5.      All jurisdictional prerequisites to bringing this action have been satisfied because:

(a)      On September 24, 2021, Morrison dual-filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"); and

(b)      On May 9, 2023, the EEOC issued a Notice of Right to Sue to Plaintiff.

6.      Venue is proper as Morrison worked at the Company, which is located in the Eastern District of Pennsylvania.

## The Parties

7.      Morrison resides in West Lawn, Pennsylvania and is currently 74 years old.

8.      The Company provides contract manufacturing/toll processing services to a wide variety of industries. The Company's headquarters is located at 2 Birchmont Drive, Reading, Pennsylvania 19606.

9.      Upon information and belief, the Company employs over 150 employees.

10.      At all relevant times, Adams was an employee in the Company's Human Capital and Talent Acquisition department.

11.      At all relevant times, Readinger was an employee in the Company's Human Capital and Talent Acquisition department.

2

12. At all material times hereto, the Company acted through its employees, agents, representatives and/or servants who were acting within the course and scope of their employment and authority.

## Factual Background

13. Morrison joined the Company as a lead chemical mill operator in 2003 at the invitation of Vice President Jeff Klinger (Klinger).

14. Morrison was recommended to Klinger by an executive at the mill-building company where Morrison had worked for several years prior to joining the Company.

15. At the time, the Company was a fairly new and small company with fewer than ten employees. Klinger recognized that Morrison's prior experience in the mill industry would make Morrison a valuable asset to the Company's growing business.

16. Morrison was in his mid-fifties when the Company hired him. Morrison expressed that he wanted to work for many more years and told Klinger that he did not want to have to hunt for another job at an advanced age.

17. Klinger reassured Morrison that he would have a job for as long as he wanted, provided the Company was still in business.

18. With these assurances, Morrison agreed to join the Company as a lead chemical operator.

19. Throughout his tenure, Morrison worked twelve-hour days of intense physical labor in hot conditions while wearing heavy personal protective equipment to avoid exposure to chemicals and powders on surfaces and in the air.

20. While these demanding conditions resulted in high employee turnover among mill operators, Morrison devoted his fullest efforts to the Company for almost two decades.

21. Based on his wealth of experience, Morrison was often responsible for training and mentoring new chemical mill operators.

22. The Company's reviews of Morrison's work performance reflected his successes, noting Morrison's "solid performance," "willing[ness] to put in extra effort," ability to "adapt[] to new situations and demands," as well as his accountability, reliability, mentorship, teamwork, and compliance with company policies.

23. The Company's most recent review of Morrison's work performance in the fall of 2020 noted that Morrison "made very few mistakes," made a "strong effort to always hit standard rates for jobs," "follow[ed] company safety policies," and was "eager to share [my] knowledge with other associates to help contribute to their success."

24. In recognition of his outstanding performance, the Company gave Morrison annual raises and numerous awards for his dedication and teamwork.

25. During his tenure, Morrison was formally disciplined just once, for a verbal dispute with coworkers many years ago. Otherwise, Morrison enjoyed positive working relationships with supervisors and colleagues.

26. In early 2021, Morrison's doctor determined that he would need a total knee replacement. The surgery was scheduled for February 22, 2021.

27. As soon as Morrison knew the surgery date, he met with Adams and Readinger from the Company's Human Capital and Talent Acquisition department to make the necessary arrangements for his medical leave.

28. Morrison told Adams and Readinger that his doctor informed him that it might take nine to twelve months for his knee to fully heal and allow him to resume regular duties, which required heavy lifting among other physical demands.

4

29.     Adams and Readinger explained that the FMLA entitled him to twelve weeks of unpaid leave. They further explained that Morrison could receive income through short-term disability insurance beginning one week after his surgery and then continuing for twenty-six weeks.

30.     Morrison exhausted his vacation days for the year in the weeks before and after his surgery. The Company allowed Morrison to use his vacation days in the days leading up to his surgery because these days would expire in August 2021, before Morrison's anticipated return date after full recovery.

31.     Morrison also used vacation days to provide income for the week following his surgery, before he was eligible to receive short-term disability benefits.

32.     Adams and Readinger explained that once Morrison exhausted his twenty-six weeks of short-term disability payments, he could receive long-term disability payments which would be the same amount as the short-term disability benefits but paid monthly.

33.     Neither Adams nor Readinger expressed any concerns with the anticipated timeline for Morrison's full recovery, and neither asked for a more specific return date.

34.     Neither Adams nor Readinger—nor anyone else at the Company—ever suggested that taking leave to recover from his surgery would jeopardize Morrison's employment.

35.     Morrison's surgery on February 22, 2021 was successful and he began the rehabilitation process.

36.     Morrison filled out his application for short-term disability benefits on February 24, 2021. On that application, Morrison indicated his intent to return to work at full strength once he recovered from the surgery, as he had verbally communicated to Adams and Readinger.

37.     Morrison received a call from Adams in early June 2021. Adams asked how Morrison was doing. Morrison responded that he was going to physical therapy three days a week and doing exercises at home. Adams said that was great and ended the call.

38. Adams did not ask Morrison for a return-to-work date during the early June 2021 call, nor did she indicate that Morrison's job was at risk.

39. As Morrison had already informed Adams that he would likely need at least nine months to fully recover from this surgery, Morrison assumed the call was simply a courtesy to a long-time employee, not a means of determining whether Morrison was able to return to work immediately.

40. Morrison received an email from Adams on June 25, 2021, with a termination letter attached.

41. The termination letter stated Morrison had "exhausted all available sick and vacation leave as well as the unpaid leave of absence granted to [me] as an accommodation," and that the Company could not accommodate his absence any longer.

42. Until Morrisons received the June 25, 2021 termination letter, no one at the Company had stated that the Company could only "accommodate" Morrison for four months—despite having known the timeline for Morrison's recovery since January 2021.

43. Three days later, Morrison called Scott Lehr, an In-House Consultant for the Company and former Director of Operations, to ask why he had been fired.

44. Lehr was unaware of Morrison's firing and said it did not sound right. Lehr promised to find out more and call Morrison back, but never did so.

45. On July 9, 2021, Morrison received an email from Catie Krajewski in the Company's Human Capital and Talent Acquisition department asking for dates he was available for the Company to throw a "retirement lunch to celebrate [him] and thank [him] for [his] many years of service" at the Company.

46. This offer of a "retirement lunch" added insult to injury because the Company had fired Morrison.

47.    Morrison had not voluntarily retired or even suggested to the Company that he planned to stop working. To the contrary, Morrison had made plain to the Company's representatives his intention to fully return to his regular duties as soon as he was able.

48.    The Company's assertion that Morrison had "retired" also suggested that they believed Morrison was too old to continue working, either at the Company or at another job.

49.    At the time of his firing, Morrison was able to walk and drive and could have performed multiple elements of his job as a chemical mill operator without any limitations or accommodations.

50.    For example, about one quarter of a chemical mill operator's time is spent preparing and testing materials and equipment to ensure everything is processed according to specifications. Typically, a mill operator does the testing and preparation for his own mill, but if another person does that work it allows the mill operator to do other tasks more quickly.

51.    At the time of his termination, Morrison could have performed preparation and testing duties to expedite the work of the other mill operators.

52.    There was precedent at the Company for such an accommodation. About six months before Morrison began medical leave, the Company gave another chemical mill operator, Brian Rollins, the light-duty assignment of testing and prepping materials for other operators while recovering from a back injury.

53.    There are ten mills in the facility where Morrison worked. Because testing and prepping takes about one-quarter of each mill operator's time, the facility could have had at least two people doing that job alone full-time.

54.    In addition to testing and prepping, the Company could have—and for other employees has—made other arrangements to allow employees to return to work following major injuries. Within the past two years of Morrison's employment with the Company, Norbert

7

DeBooth was given the light-duty task of sitting in a reclining chair and counting drums as they were unloaded from trailers for three to four months.

55.     The Company has also given other employees cleaning or other light-duty assignments while they healed from injuries.

56.     Additionally, Morrison could have trained new employees. The Company regularly had its most senior employees, including Morrison, spend full days training new chemical mill operators. Morrison estimates that in his four months of medical leave, the Company hired about sixty new chemical mill operators at its three locations. Morrison could have worked full-time training all the new employees.

57.     Finally, once Morrison's knee fully healed, he would have been able to complete all the tasks required of a chemical mill operator.

58.     To the best of Morrison's knowledge, the Company has not given light-duty accommodations to other chemical mill operators in their sixties or seventies, like Morrison. Upon information and belief, DeBooth and Rollins are both around the age of fifty, about twenty years younger than Morrison.

59.     At the time of his firing, Morrison was almost seventy-four years old.

60.     At all relevant times, Morrison was disabled under the ADAAA and PHRA due to his knee condition.

61.     At all relevant times, Morrison was disabled under the ADAAA and PHRA because Defendants regarded him as disabled, or he had a record of a disability.

62.     Defendants failed to reasonably accommodate Morrison's requests regarding his disability.

8

63.    Defendants fired Morrison due to age discrimination and/or disability discrimination (actual disability, record of disability, regarded as disabled, or retaliation for requesting reasonable accommodations).

64.    Defendants retaliated against Morrison for requesting reasonable accommodations or due to his disability and/or because Morrison requested and/or utilized FMLA-qualifying leave.

65.    The Company's actions have caused Morrison significant financial loss, as well as emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation, embarrassment, and loss of dignity.

### Count I
### Age Discrimination (ADEA and PHRA)

66.    Paragraphs 1-65 are incorporated by reference as if fully set forth herein.

67.    The acts, failures to act, practices and policies of Defendants set forth above constitute age discrimination and violate the ADEA and PHRA.

68.    Adams and Readinger are sued individually under the PHRA (and not under the ADEA) because they aided and abetted the Company's discriminatory conduct against Morrison.

WHEREFORE, Morrison respectfully requests this Court:

A.    Issue a Declaratory Judgment declaring that Defendants' actions as set forth in this Complaint are unlawful and violate the ADEA and PHRA.

B.    Issue equitable/injunctive relief including:

(1)    Issue preliminary and permanent injunctions enjoining and restraining Defendants, their officers, agents, employees, and those acting in participation with Defendants, from engaging in any act or practice of harassment, discrimination, and/or retaliation against employees in violation of the ADEA and PHRA.

9

(1)      Order the Company to provide training to all employees on harassment, discrimination, and retaliation prevention and related compliance under the ADEA and PHRA—with the training specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows.

(3)      Order the Company to deliver to its employees a copy of the jury verdict and trial court judgment.

(4)      Order the Company to report on the manner of compliance with the terms of any final order for non-monetary equitable relief issued under the ADEA and PHRA—with the reporting specifics to be tailored based on the evidence.

(5)      Order the Company to reinstate Morrison upon such terms and conditions as will put Morrison in the position he would have occupied had Defendants not unlawfully discriminated against him.

C.      Enter judgment in favor of Morrison and against Defendants for back pay, including wages and fringe benefits.

D.      Enter judgment in favor of Morrison for front pay in lieu of reinstatement.

E.      Enter judgment in favor of Morrison and against Defendants for compensatory damages for emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation, embarrassment, and loss of dignity.

F.      Enter judgment in favor of Morrison and against the Company for liquidated damages, as allowable by law.

G.      Award Morrison reasonable attorney's fees together with the costs of this action.

H.      Award Morrison pre-judgment and post-judgment interest.

I.      Enter judgment in favor of Morrison for any other monetary losses as a direct result of Defendants' violation of the ADEA and PHRA, including but not limited to negative tax consequence damages.

J.      Award such other and further legal and equitable relief as may be necessary and appropriate to redress fully the deprivation of Morrison's rights, to prevent their recurrence in the future and to protect other employees from such unlawful behavior.

## Count II
## Disability Discrimination (ADAAA and PHRA)

69.     Paragraphs 1-68 are incorporated by reference as if fully set forth herein.

70.     The acts, failures to act, practices and policies of Defendants set forth above constitute disability discrimination (actual disability, regarded as disabled, record of disability, failure to provide reasonable accommodations) and violate the ADAAA and PHRA.

71.     Adams and Readinger are sued individually under the PHRA (and not under the ADAAA) because they aided and abetted the Company's discriminatory conduct against Morrison.

WHEREFORE, Morrison respectfully requests this Court:

A.      Issue a Declaratory Judgment declaring that Defendants' actions as set forth in this Complaint are unlawful and violate the ADAAA and PHRA.

B.      Issue equitable/injunctive relief including:

(1)     Issue preliminary and permanent injunctions enjoining and restraining Defendants, their officers, agents, employees, and those acting in participation with Defendants, from engaging in any act or practice of harassment, discrimination, and/or retaliation against employees in violation of the ADAAA and PHRA.

11

(1)     Order the Company to provide training to all employees on harassment, discrimination, and retaliation prevention and related compliance under the ADAAA and PHRA—with the training specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows.

(3)     Order the Company to deliver to its employees a copy of the jury verdict and trial court judgment.

(4)     Order the Company to report on the manner of compliance with the terms of any final order for non-monetary equitable relief issued under the ADAAA and PHRA—with the reporting specifics to be tailored based on the evidence.

(5)     Order the Company to reinstate Morrison upon such terms and conditions as will put Morrison in the position he would have occupied had Defendants not unlawfully discriminated against him.

C.     Enter judgment in favor of Morrison and against Defendants for back pay, including wages and fringe benefits.

D.     Enter judgment in favor of Morrison for front pay in lieu of reinstatement.

E.     Enter judgment in favor of Morrison and against Defendants for compensatory damages for emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation, embarrassment, and loss of dignity.

F.     Enter judgment in favor of Morrison and against the Company for punitive damages, as allowable by law.

G.     Award Morrison reasonable attorney's fees together with the costs of this action.

H.     Award Morrison pre-judgment and post-judgment interest.

I.      Enter judgment in favor of Morrison for any other monetary losses as a direct result of Defendants' violation of the ADAAA and PHRA, including but not limited to negative tax consequence damages.

J.      Award such other and further legal and equitable relief as may be necessary and appropriate to redress fully the deprivation of Morrison's rights, to prevent their recurrence in the future and to protect other employees from such unlawful behavior.

## COUNT III
### Disability Retaliation (ADAAA and PHRA)

72.     Paragraphs 1-71 are incorporated by reference as if fully set forth herein.

73.     The acts, failures to act, practices and policies of Defendants set forth above constitute disability retaliation (including retaliatory firing) in violation of the ADAAA and PHRA.

74.     Adams and Readinger are sued individually under the PHRA (and not under the ADAAA) because they aided and abetted the Company's retaliatory conduct against Morrison.

WHEREFORE, Morrison respectfully requests this Court:

A.      Issue a Declaratory Judgment declaring that Defendants' actions as set forth in this Complaint are unlawful and violate the ADAAA and PHRA.

B.      Issue equitable/injunctive relief including:

(1)     Issue preliminary and permanent injunctions enjoining and restraining Defendants, their officers, agents, employees, and those acting in participation with Defendants, from engaging in any act or practice of harassment, discrimination, and/or retaliation against employees in violation of the ADAAA and PHRA.

(1)     Order the Company to provide training to all employees on harassment, discrimination, and retaliation prevention and related compliance under the ADAAA and

13

PHRA—with the training specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows.

(3)    Order the Company to deliver to its employees a copy of the jury verdict and trial court judgment.

(4)    Order the Company to report on the manner of compliance with the terms of any final order for non-monetary equitable relief issued under the ADAAA and PHRA—with the reporting specifics to be tailored based on the evidence.

(5)     Order the Company to reinstate Morrison upon such terms and conditions as will put Morrison in the position he would have occupied had Defendants not unlawfully retaliated against him.

C.    Enter judgment in favor of Morrison and against Defendants for back pay, including wages and fringe benefits.

D.    Enter judgment in favor of Morrison for front pay in lieu of reinstatement.

E.    Enter judgment in favor of Morrison and against Defendants for compensatory damages for emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation, embarrassment, and loss of dignity.

F.    Enter judgment in favor of Morrison and against the Company for punitive damages, as allowable by law.

G.    Award Morrison reasonable attorney's fees together with the costs of this action.

H.    Award Morrison pre-judgment and post-judgment interest.

I.    Enter judgment in favor of Morrison for any other monetary losses as a direct result of Defendants' violation of the ADAAA and PHRA, including but not limited to negative tax consequence damages.

14

J.      Award such other and further legal and equitable relief as may be necessary and appropriate to redress fully the deprivation of Morrison's rights, to prevent their recurrence in the future and to protect other employees from such unlawful behavior.

**Count IV**
**Retaliation (FMLA)**

75.     Paragraphs 1-75 are incorporated by reference as if fully set forth herein.

76.     Morrison was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

77.     Morrison took time off from working with the Company, his employer, with whom he had been employed for at least twelve months pursuant to the requirements of 29 U.S.C. § 2611(2)(i).

78.     Morrison had at least 1,250 hours of service with the Company during his last full year of employment (pre-FMLA request).

79.     Defendants are engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

80.     Morrison was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of leave on a block or intermittent basis.

81.     Defendants committed retaliation violations of the FMLA by: (1) firing Morrison for requesting and/or utilizing FMLA-qualifying leave; and/or (2) taking actions towards Morrison that would dissuade a reasonable person from exercising his/her rights under the FMLA.

82.     Defendants' actions constitute violations of the FMLA.

WHEREFORE, Morrison respectfully requests this Court:

A. Issue a Declaratory Judgment declaring that Defendants' actions as set forth in this Complaint are unlawful and violate the FMLA.

B. Issue equitable/injunctive relief including:

(1) Issue preliminary and permanent injunctions enjoining and restraining Defendants, their officers, agents, employees, and those acting in participation with Defendants, from engaging in any act or practice of harassment, discrimination, and/or retaliation against employees in violation of the FMLA.

(1) Order the Company to provide training to all employees on harassment, discrimination, and retaliation prevention and related compliance under the FMLA—with the training specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows.

(3) Order the Company to deliver to its employees a copy of the jury verdict and trial court judgment.

(4) Order the Company to report on the manner of compliance with the terms of any final order for non-monetary equitable relief issued under the FMLA—with the reporting specifics to be tailored based on the evidence.

(5) Order the Company to reinstate Morrison upon such terms and conditions as will put Morrison in the position he would have occupied had Defendants not unlawfully retaliated against him.

C. Enter judgment in favor of Morrison and against Defendants for back pay, including wages and fringe benefits.

D. Enter judgment in favor of Morrison for front pay in lieu of reinstatement.

E. Enter judgment in favor of Morrison and against the Company for liquidated damages, as allowable by law.

F.    Award Morrison reasonable attorney's fees together with the costs of this action.

G.    Award Morrison pre-judgment and post-judgment interest.

H.    Enter judgment in favor of Morrison for any other monetary losses as a direct result of Defendants' violation of the FMLA, including but not limited to negative tax consequence damages.

I.    Award such other and further legal and equitable relief as may be necessary and appropriate to redress fully the deprivation of Morrison's rights, to prevent their recurrence in the future and to protect other employees from such unlawful behavior.

## Jury Demand

Morrison demands a jury to try all claims triable by jury.

Respectfully submitted,

Dated: May 12, 2023

Stephanie J. Mensing
PA ID No. 89625
Mensing Law LLC
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(215) 586-3751; (215) 359-2741 fax
stephanie@mensinglaw.com
Attorney for Plaintiff

17